United States Court of Appeals,

Fifth Circuit.

No. 94-50631.

GORE, INC., d/b/a Pure Milk Co., Plaintiff-Appellant,

v.

Michael ESPY, as Secretary of U.S. Department of Agriculture, Defendant-Appellee.

July 16, 1996.

Appeal from the United States District Court for the Western District of Texas.

Before POLITZ, Chief Judge, JONES and PARKER, Circuit Judges.

POLITZ, Chief Judge:

Gore, Inc., doing business as Pure Milk Co., appeals an adverse summary judgment sustaining a ruling by the Secretary of Agriculture that Gore's delivery of packaged milk products to a customer's distribution center constituted a shipment to a milk plant under 7 C.F.R. § 1126.4. Concluding that the Secretary's interpretation is arbitrary, capricious, and plainly inconsistent with the text of the regulation, we reverse.

*Background*

The Agriculture Marketing Agreement Act of 1937[1] governs the distribution, sale, and marketing of all milk products.[2] The AMAA

---

[1]7 U.S.C. § 601 *et seq.* (1992 & Supp.1995).

[2]In *Block v. Community Nutrition Institute,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), the Supreme Court described Congress' motivation for regulating the milk industry:

> In the early 1900's, dairy farmers engaged in intense competition in the production of fluid milk products. To bring this destabilizing competition under control,

is implemented regionally by the Secretary who has adopted milk marketing regulations.[3] These regulations, often referred to as "orders," establish a labyrinthine price support scheme.[4] Under the Texas Order,[5] producers[6] receive a "blend price" from the handlers[7] who purchase and distribute their milk.[8] The blend price is the uniform price paid to producers for all milk sold to handlers regardless of the milk's eventual use.[9] The AMAA

> the 1937 Act authorizes the Secretary to issue milk marketing orders setting the minimum prices the handlers (those who process dairy products) must pay to producers (dairy farmers) for their milk products. The "essential purpose [of this milk market order scheme is] to raise producer prices," and thereby to ensure that the benefits and burdens of the milk market are fairly and proportionately shared by all dairy farmers.

*Id.* at 341, 104 S.Ct. at 2452 (internal citations omitted).

[3]*Suntex Dairy v. Block,* 666 F.2d 158 (5th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 59, 74 L.Ed.2d 62 (1982). *See e.g.* 7 C.F.R. pt. 1126 (1995) (Texas marketing order).

[4]*Suntex Dairy; see also* 7 U.S.C. § 608c (1992 & Supp.1995); 7 C.F.R. pt. 1126 (1995).

[5]7 C.F.R. § 1126.2 (1995) (establishing the boundaries for the Texas milk marketing area).

[6]7 C.F.R. § 1126.12 (1995). Dairy farms are producers under this definition.

[7]7 C.F.R. § 1126.9 (1995).

[8]7 C.F.R. § 1126.61 (1995).

[9]7 C.F.R. § 1126.61 (1995). The AMAA's price support system is premised on the fact that the price handlers are willing to pay for milk depends upon its use. *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339 (6th Cir.1994), *cert. denied,* --- U.S. ----, 116 S.Ct. 50, 133 L.Ed.2d 15 (1995). Under the Texas order, milk distributed in fluid form is classified as Class I. 7 C.F.R. § 1126.50(a) (1995). Class I commands the highest minimum price. 7 C.F.R. § 1126.50(a) (1995). Class II uses, which include yogurt and cream, command an intermediary minimum price. 7

recognizes the unlikelihood that each handler will use milk purchases in a manner exactly reflecting the average utilization in the market as a whole.[10] The Texas Order establishes a producer-settlement fund into which handlers directing a greater than average proportion of their milk into the more valuable fluid uses must make payments.[11] Handlers directing a lesser than average proportion of their total milk into such fluid uses receive payments from that fund.[12]

An operator of both a dairy farm and a processing plant is designated as a producer-handler.[13] Producers-handlers are entitled to certain benefits, including the ability to sell their products without regard to the pricing scheme.[14] Milk received from a producer-handler at the plant of a regulated handler is designated as a lower Class III receipt, regardless of the price actually paid to the producer-handler or the actual use of the milk by the handler.[15] Thereafter, if the handler applies the milk to a higher

---

C.F.R. § 1126.50(b) (1995). Class III and IIIA uses command the lowest minimum prices. 7 C.F.R. § 1126.50(c), (d) (1995).

[10]*See Lehigh Valley Farmers v. Block,* 829 F.2d 409 (3d Cir.1987).

[11]7 C.F.R. § 1126.71 (1995).

[12]7 C.F.R. § 1126.71 (1995).

[13]7 C.F.R. § 1126.10 (1995).

[14]*See* 7 C.F.R. § 1126.7(f)(1) (1995).

[15]7 C.F.R. § 1126.14 and 1126.44 (1995). Although Gore could sell its milk at any price due to its status as a producer-handler, the record reflects that Gore sold its milk at a premium over the Class I minimum price.

value use it must pay the difference into the producer-settlement fund.

Gore is a vertically integrated milk producer, owning a dairy, a processing plant, and a packaging facility. As such, it is designated as a producer-handler under the Texas Order. H.E. Butt Company (HEB), a grocery company operating in Texas, purchases packaged fluid milk from Gore for sale in its retail stores. In addition to purchasing packaged fluid milk from Gore, HEB also owns and operates a milk plant.

HEB operates a large complex in San Antonio, Texas, housing its milk production plant, an ice cream plant, a bakery, and a Perishables Distribution Center (PDC). The PDC is housed under the same roof and shares a common wall with the milk production plant but is entirely separate therefrom.[16] The record reflects that the PDC is exclusively a distribution center.[17]

Perishable goods sold by HEB, including the milk purchased from Gore,[18] milk produced in the HEB milk processing plant, and various other items such as cut flowers, eggs, and meat are delivered to the PDC.[19] Once delivered to the PDC, the goods are

---

[16]The PDC has its own receiving and loading docks and is managed separately.

[17]The record establishes that the PDC turns over its entire inventory 200 to 250 times each year.

[18]Gore previously delivered all of the milk directly to the individual HEB retail stores but began delivering a portion to the PDC to increase efficiency.

[19]The milk processed in the HEB plant passes through the wall between the plant and the PDC on a conveyor belt.

4

loaded onto trucks for distribution to the HEB retail stores. There is no connection between the milk processing plant and the PDC that does not also exist between the origin of the non-milk perishable goods and the PDC.[20]

The market administrator[21] for the Texas Order determined that HEB's receipt of Gore's milk constituted a receipt of milk from a producer-handler at the processing plant of a regulated handler. As such, the receipt was classified as Class III.[22] From this premise HEB's subsequent sale of the milk purchased from Gore as Class I fluid milk called for a deposit into the producer-settlement fund. Gore paid $366,772.38 into the producer-settlement fund on behalf of HEB to avoid loss of HEB as a customer.[23]

Gore sought administrative review,[24] maintaining that the PDC is a separate distribution facility which is specifically excepted from the definition of a plant.[25] The Administrative Law Judge

---

[20]No raw milk to be processed by the HEB processing plant is delivered to the PDC and no processed milk ever passes from the PDC into the processing plant.

[21]The Secretary acts through the market administrator. 7 C.F.R. § 1000.3 (1995).

[22]7 C.F.R. §§ 1126.14 and 1126.44 (1995).

[23]Gore concedes that if the Secretary's interpretation is correct $366,772.38 is the amount HEB properly owed to the producer-settlement fund.

[24]*See* 7 U.S.C. § 608c(15)(A) (1992).

[25]7 C.F.R. § 1126.4 (1995) ("[S]eparate facilities used only as a distribution point for storing packaged milk in transit for route distribution shall not be a plant under this definition.").

deferred to the Secretary's interpretation[26] and the Secretary's chief judicial officer affirmed.

The instant action followed. The parties submitted cross-motions for summary judgment. The district court referred this matter to a magistrate judge who recommended granting Gore's motion for summary judgment. After a *de novo* review, the district court determined to grant the Secretary's motion for summary judgment. Gore timely appeals.

*Analysis*

A. Standing

At the threshold we must determine whether Gore possesses standing. The Supreme Court teaches that "the term standing subsumes a blend of constitutional requirements and prudential considerations."[27] To satisfy the requirements of Article III a plaintiff must have suffered an injury in fact, caused by the challenged government conduct, which is likely to be redressed by the relief sought.[28] In addition to the constitutional requirement, the Supreme Court has also taught that we should consider certain prudential principles in determining whether a plaintiff has standing. Specifically, we must resolve whether the plaintiff's conduct falls within the zone of interest protected or regulated by

---

[26]The ALJ deferred but noted the persuasive force of Gore's position.

[27]*Apache Bend Apartments, Ltd. v. United States through the Internal Revenue Service,* 987 F.2d 1174, 1176 (5th Cir.1993) (en banc) (internal quotations omitted).

[28]*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

the statute.[29]  Only those belonging to the class that the law was designed to protect may sue.[30]  We must also inquire whether the plaintiff is asserting personal legal rights and interests.

Gore possesses constitutional standing;  it was injured in fact by the Secretary's interpretation of 7 C.F.R. § 1126.4 which essentially foreclosed at least one very valuable market to Gore, *i.e.,* the HEB account, and we may relieve that injury by rejecting that interpretation.[31]  Further, Gore belongs to the class of persons regulated by the AMAA[32] and, as such, is within the zone of interests protected or regulated by the statute.[33]  Finally, other prudential considerations do not weigh against a finding of standing.

B. The Secretary's Interpretation of 7 C.F.R. § 1126.4

---

[29]*Apache Bend* (citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)).  *See also Lujan,* 497 U.S. at 883, 112 S.Ct. at 3186 (emphasis in original) ("[T]he plaintiff must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him* ) falls within the "zone of interests' sought to be protected by the statutory provisions whose violation forms the legal basis for his complaint.").

[30]*Sabine River Authority v. U.S. Dep't of Interior,* 951 F.2d 669 (5th Cir.), *cert. denied,* 506 U.S. 823, 113 S.Ct. 75, 121 L.Ed.2d 40 (1992).

[31]*See Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (foreclosure of a market constitutes an injury in fact).

[32]*See* 7 U.S.C. § 601 *et seq.* (1992);  7 C.F.R. pt. 1126 (1995).

[33]*See Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987);  *cf. Block v. Community Nutrition Institute,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984).

Gore contends that the Secretary grossly erred in interpreting the definition of "plant" found in 7 C.F.R. § 1126.4. Gore maintains that the PDC is specifically excluded under the definition of "plant."

Our review is governed by the Administrative Procedure Act which requires that we determine whether the Secretary's interpretation of the regulation was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[34] In such review we routinely defer to an agency's construction of its own regulations,[35] but our examination "should not be categorized as a summary endorsement of the agency's actions. A reviewing court does not serve the function of a mere rubber stamp of agency decisions."[36] Rather, we must undertake a careful and searching examination, ensuring that the agency's interpretation is rational and not plainly inconsistent with the text of the regulation.[37]

The text of the regulation defines a "plant" as

---

[34]5 U.S.C. § 706(2)(A) (1989); *Pacific Gas Transmission Co. v. F.E.R.C.,* 998 F.2d 1303 (5th Cir.1993); *Acadian Gas Pipeline System v. F.E.R.C.,* 878 F.2d 865 (5th Cir.1989).

[35]*See e.g., Acadian Gas; Pacific Gas.*

[36]*Acadian Gas,* 878 F.2d at 868. The review of an agency's interpretation of its regulations is different than the review of an agency's interpretation of the statute it is charged to interpret under *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Pacific Gas; Marlowe v. Bottarelli,* 938 F.2d 807 (7th Cir.1991).

[37]*Acadian Gas; Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945) (An agency's interpretation of its own regulations must comport with "the plain words of the regulation.").

8

the land, buildings, facilities, and equipment constituting a single operating unit or establishment at which milk or milk products (including filled milk) are received, processed, or packaged....    [S]eparate    facilities    used    only    as    a distribution point for storing packaged milk in transit for route disposition shall not be a plant under this definition.[38]

Gore contends the PDC is a "separate facility used only as a distribution point" even though the complex, as a whole, includes a plant within the meaning of section 1126.4.    The Secretary maintains that to constitute a separate facility, the PDC must be physically removed from the milk plant.    Based on this interpretation, the Secretary concluded that the PDC is not a separate facility because it is housed under the same roof with the milk plant.    We find the Secretary's interpretation of section 1126.4 strained, plainly inconsistent with the text of the regulation, arbitrary, capricious, and otherwise not in accordance with law.

The regulations do not define "separate facility";  we must first determine whether the Secretary applied the ordinary meaning of that term.[39]    A facility typically is defined in terms of its function;[40]    hence, the ordinary import of the phrase "separate

---

[38]7 C.F.R. § 1126.4 (1995).

[39]*Elizabeth Blackwell Health Center for Women v. Knoll,* 61 F.3d 170 (3d Cir.1995);  *see also, F.D.I.C. v. Meyer,* 510 U.S. 471, ----, 114 S.Ct. 996, 1001, 127 L.Ed.2d 308 (1994) ("[W]e construe a statutory term in accordance with its ordinary or natural meaning.").

[40]*See* Webster's Third International Dictionary 812-13 (3d ed. 1976) (defining facility as "something that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end"); Black's Law Dictionary 531 (5th ed. 1979) (defining facility as "[s]omething that is built or installed to perform some

facility" is that the subject unit functions distinctly from something else and that it possesses a different purpose.[41]

The Secretary's contention that the modifier "separate" requires that the facility be physically removed modifies the regulation, for adopting that interpretation effectively inserts the phrase "and removed" before the term "facility." Section 1126.4 on its face recognizes a distinction between facilities and buildings. This suggests that if a physically separate building were required, the ordinary term for such would have been used. We perforce conclude that the Secretary's myopic interpretation is arbitrary, capricious, and otherwise not in accordance with law.

Alternatively, the Secretary contends that even if the facilities need not be physically separate, the PDC was not functionally separate. Under section 706(2)(E) of the APA, the factual findings of the hearing officer must be upheld if supported by substantial evidence.[42] "The "substantial evidence' standard requires a determination that agency findings are supported by "such relevant evidence as a reasonable mind might accept as

particular function.").

[41]Webster's Third International Dictionary 2069 (3d ed. 1976) (defining separate as distinct, different, dissimilar in nature, or set apart); Black's Law Dictionary 1124 (5th ed. 1979) (defining separate as something that is distinct, individual, particular, or disconnected). The ordinary usage of the term "separate" does not require physical separation.

[42]5 U.S.C. § 706(2)(E) (1989); *Parchman v. United States Department of Agriculture,* 852 F.2d 858 (6th Cir.1988). The substantial evidence test only applies when a formal trial-type hearing is required under 5 U.S.C. §§ 556 and 557. *Consumers Union of the United States, Inc. v. Federal Trade Commission,* 801 F.2d 417 (D.C.Cir.1986).

adequate to support a conclusion.' "[43]  A finding that the PDC is not functionally separate is not supported by substantial evidence; rather, the evidence overwhelmingly supports the contrary conclusion.

The Secretary maintains that because milk passed from the HEB milk plant into the PDC, the PDC was part of the production process.  We are not persuaded.  As the marketing administrator recognized, the PDC is strictly an assembly point for distribution.[44]  First, no raw milk ever entered the PDC;  the milk processed in the HEB plant was completely processed, packaged, and cooled before passing through the PDC.[45]  Second, various other perishable goods passed through the PDC en route to HEB retail stores and as these perishables arrived at the PDC they quickly were loaded onto trucks for distribution.[46]  Finally, the PDC was completely separate from the HEB milk plant;  each had its own management and loading docks.  No product ever entered the PDC and was then taken into any other area of the facility.  The only physical connection between the milk plant and the PDC is the conveyor belt operating through the common wall.  This sole tenuous

---

[43]*Suntex Dairy,* 666 F.2d at 162 (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216-17, 83 L.Ed. 126 (1938)).

[44]Not only was the PDC a distribution point for the milk products, but it was also the distribution point for numerous other perishables.

[45]No milk processed by HEB ever passed from the PDC into the milk plant.

[46]The inventory of the PDC was turned over every second day.

connection is insufficient to transform a large distribution center into a component part of a milk plant. It is manifest that the Secretary's determination that the PDC constituted a plant under section 1126.4 is not supported by substantial evidence.

Gore seeks not only invalidation of the Secretary's interpretation that the delivery of its processed milk to the PDC constituted a delivery to a plant, but it also seeks reimbursement for the $366,772.38 paid into the producer-settlement fund on behalf of HEB. Gore paid this money because of the Secretary's now-rejected interpretation of section 1126.4 (or, alternatively, the Secretary's unsupported conclusion that the PDC was not functionally separate) and, therefore, is entitled to a refund of that amount from the producer-settlement fund.[47]

The judgment appealed is REVERSED, judgment consistent herewith in favor of Gore is RENDERED, and the matter is REMANDED for appropriate disposition.

---

[47]*See Abbotts Dairies Division of Fairmont Foods v. Butz,* 584 F.2d 12 (3d Cir.1978); *see also* 7 U.S.C. § 608c(15)(B) (1992) (granting jurisdiction in equity).