Edward **CHEN**, et al., Plaintiffs,

v.

**CITY OF HOUSTON**, Defendant.

No. Civ.A. H–97–1180.

United States District Court,
S.D. Texas,
Houston Division.

May 6, 1998.

Paul Loy Hurd, Monroe, LA, Douglas E. Markham, Houston, TX, Robert Popper, New York City, for Plaintiffs.

Claude Robert Heath, Bickerstaff Heath et al, Sydney W. Falk, Jr., Bickerstaff Heath Smiley Pollan Kever and McDaniel, Austin, TX, for Defendant.

## MEMORANDUM OPINION

ATLAS, District Judge.

### I. INTRODUCTION

Plaintiffs, residents of the Defendant City of Houston (the "City,"),[1] filed this voting rights case alleging that the City engaged in racial gerrymandering in developing its 1997 city council redistricting plan. The 1997 redistricting was required because the City in late 1996 annexed the Kingwood area with a population of over 40,000 and three other populated areas with a combined population of almost 5,000 persons.[2] In July 1997, the City's 1997 redistricting plan received Department of Justice preclearance pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c ("Section 5").

Plaintiffs allege that the City's decision to assign the newly-annexed Kingwood area in northeast Houston to the Clear Lake area in southeast Houston as District E violates several provisions of the United States Constitution. Specifically, Plaintiffs allege that the 1997 redistricting plan violates the requirement for ballot secrecy; violates their rights under the First Amendment to petition for redress of grievances and to assemble for political purposes; violates their rights under the Equal Protection Clause to associate with fellow citizens for political purposes and to advocate for the candidate of their choice; and violates the Equal Protection Clause's "one-person, one-vote" principle. Plaintiffs also allege that the 1997 redistricting plan constitutes racial gerrymandering in violation of the Fourteenth and Fifteenth Amendments.

The case is now before the Court on the City's **Motions for Summary Judgment** [Docs. # 59, # 60, # 62, # 61 and # 55] as to each of these five claims, and on the City's **Motion to Dismiss Plaintiffs Blum and Vera** [Doc. # 63].[3] Plaintiffs have filed their opposition to the Motions, and the City has filed its Replies. Plaintiffs, without leave of court, subsequently filed a further response to the City's Replies. Plaintiffs' Brief in Further Opposition to Defendant's Motion

1. Plaintiff Edward Blum ("Blum") is no longer a resident of the City of Houston and is one of the subjects of the City's Motion to Dismiss Plaintiffs Edward Blum and Al Vera ("Vera") [Doc. # 63].

2. The Kingwood annexation was unique because of its size; it was "twice as big as all the annexations [the City] had done during the 90s, prior to that time." Deposition of Jerry Wood, Exh. C to Plaintiffs' Response to Motion for Summary Judgment on Fourteenth and Fifteenth Amendment Claims [Doc. # 67], at 104.

3. The Motion to Dismiss was also docketed, improperly, as Doc. # 66.

for Summary Judgment on Fourteenth and Fifteenth Amendment Claims [Doc. # 83] ("Plaintiffs' Surreply"). Based on the Court's careful consideration of the entire record in this case, the evidence presented by the parties, and the applicable authorities, the Motions each are **GRANTED**.

## II. *APPLICABLE LEGAL STANDARDS*

### A. *Standard for Summary Judgment*

The United States Supreme Court has held that a motion for summary judgment is properly granted unless there is evidence "on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56 is an integral part of the Federal Rules of Civil Procedure, recognizing a party's right to demonstrate that certain claims have no factual or legal basis and to have those unsupported claims disposed of prior to trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Because of the "sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments," and the "intrusive potential of judicial intervention into the legislative realm," federal courts should carefully apply the proper summary judgment analysis when assessing "the adequacy of a plaintiff's showing at the various stages of [redistricting] litigation and determining whether to permit discovery or trial to proceed." *Miller v. Johnson*, 515 U.S. 900, 916–17, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995).

"Summary judgment is required when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 334 (5th Cir.1998). The burden is on the nonmovant to demonstrate with "significant probative evidence" that there is an issue of material fact warranting a trial. *Texas Manufactured Housing Ass'n v. Ned-erland*, 101 F.3d 1095, 1099 (5th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997). The nonmovant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a mere scintilla of evidence. *Douglass v. United Services Automobile Ass'n*, 65 F.3d 452, 459 (5th Cir.1995), *revised on other grounds*, 79 F.3d 1415 (5th Cir.1996) (*en banc*); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc*).

### B. *Standard for Article III Standing*

An alleged lack of Article III standing is a basis for a motion to dismiss and several motions for summary judgment filed by the City. The Motion to Dismiss Blum and Vera is based on the City's position that Plaintiff Blum does not have standing because his claims are moot, and that Plaintiff Vera does not have standing because he is not a properly registered voter in the City. Additionally, the City's Motions for Summary Judgment on the Ballot Secrecy, the First Amendment, the Equal Protection, and the One–Person One–Vote Claims are based in part on the City's position that Plaintiffs' admissions during deposition testimony establish that they lack standing to assert those particular claims.

An element of the case and controversy requirement of Article III of the United States Constitution is that a plaintiff must have standing to assert the claim or claims presented in the complaint. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A plaintiff does not have Article III standing unless three requirements are satisfied:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before

the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.* at 560–61, 112 S.Ct. 2130 (citations omitted); *Gore, Inc. v. Espy*, 87 F.3d 767, 771 (5th Cir.1996). The party invoking federal jurisdiction bears the burden of establishing these three elements. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

### III. *MOTION TO DISMISS BLUM AND VERA*

The City has filed a Motion to Dismiss Plaintiffs Blum and Vera [Doc. # 63] ("Motion to Dismiss") based on an alleged lack of Article III standing. To challenge the City's redistricting plan, a plaintiff must be a resident of the district which he seeks to challenge. *United States v. Hays*, 515 U.S. 737, 745, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995).

### A. *Plaintiff Blum*

■ It is undisputed that Plaintiff Blum does not currently live within the City. Blum Deposition ("Depo."), Exh. A to Motion to Dismiss, at 6. Blum does not anticipate voting in any City elections while living at his new address. *Id.* As a result, Blum no longer has a personal stake in the outcome of this proceeding, in which only injunctive and other prospective relief is sought. Blum's claims are dismissed as moot.

### B. *Plaintiff Vera*

■ Plaintiff Vera has not been a resident of District H, the only district in which he is registered to vote, since 1978. Vera Second Interrogatory Response, Exh. C to Motion to Dismiss, at # 4. He has lived at his current address, which is in District A, since October 1990. *Id.;* Vera Depo., Exh. B to Motion to Dismiss, at 5. Prior to October 1990, Vera lived at 14818 Weil Place. Vera Depo. at 35–36. The Weil Place address is in District B. Declaration of Sherry McCall, Exh. E to Motion to Dismiss.

To qualify as an eligible voter in District H under the Texas Election Code, an individual must be a resident of that district. Texas Election Code § 11.001(2). A person's residence is defined as his "domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence." Texas Election Code § 1.015(a).

Vera argues that District H remains his residence because his "intentions, if they ever would come true, are to move back" to that district. Vera Depo. at 7–8. Vera has neither alleged nor presented evidence that he is temporarily away from District H for employment, health or financial reasons.[4] Indeed, the undisputed evidence establishes that Vera has chosen to live in the City in districts other than District H for approximately twenty years. His claimed intention to return some day, which Vera concedes may not "come true," if not legally frivolous, is patently insufficient as a matter of law to support a finding that Vera is a current resident of District H. *See Alvarez v. Espinoza*, 844 S.W.2d 238, 248 (Tex.App.—San Antonio 1992, *writ dism'd w.o.j.*) (although claimed intention to reside in the district, voter had not actually lived within the district for several years).

Vera's reliance on his having improperly continued to vote in District H and to serve in election positions serving District H during the past twenty years is misplaced.[5]

---

4. In many cases, voters who are away from their prior residences for employment, health or financial reasons are nonetheless found by the Texas courts to be residents of their new home, not of the prior residence. *See Slusher v. Streater*, 896 S.W.2d 239, 246 (Tex.App.—Houston [1st Dist.] 1995, no writ) (voter who for health and financial reasons moved from Kemah, where she had lived since she was a small child, to a federally-subsidized rental apartment in Dickinson held not to be resident of Kemah); *Zuniga v. Almaraz*, 514 S.W.2d 331, 334–35 (Tex.Civ.App.—San Antonio 1974, no writ) (voter who for twenty-five years worked in Corpus Christi during the week,

but returned to a rented house in Jim Hogg County most weekends, held not to be resident of Jim Hogg County).

5. Vera proffers that he served as the election judge of Precinct 1 in the 1970s and 1980s; that he was selected as a delegate or alternate to the National Republican Convention from Precinct 1 in 1984, 1988, and 1992; and that he was a member of the Electoral College for the congressional district encompassing Precinct 1 in 1992. Response to Motion to Dismiss, Doc. # 69, at 2.

There is no evidence that Vera advised the voter registrar that he had moved from the address in District H as required by section 15.021(a) of the Texas Election Code. Vera cannot establish that he is currently a resident of District H based on having failed to comply with applicable state law and, thereby, having successfully avoided detection of his change of residence.

Vera also cannot establish that he is currently a resident of District H based on newspaper accounts of persons registered to vote in districts in which they do not reside.[6] The sole issue with reference to the Motion to Dismiss Vera is whether he is a resident of District H for purposes of Article III standing. The media-reported status of other voters is not relevant to this issue.

### C. *Dismissal of Plaintiffs Blum and Vera*

It is undisputed that Plaintiff Blum is no longer a resident of the City. Plaintiff Vera is not a resident of District H and, as a result, his registration there is not effective under Texas law. Vera is not registered to vote in the district of his residence. Plaintiffs Blum and Vera do not have a recognizable personal interest in a favorable outcome in this litigation for prospective relief. *See Lujan,* 504 U.S. at 561, 112 S.Ct. 2130. Vera is not suffering an actual injury because he is not properly registered to vote in any district in the City. *See Hays,* 515 U.S. at 745, 115 S.Ct. 2431. Consequently, Blum and Vera lack standing and must be dismissed as Plaintiffs.

### IV. *MOTION FOR SUMMARY JUDGMENT ON BALLOT SECRECY CLAIM*

Plaintiffs allege that the City's 1997 redistricting plan created "small or sliver precincts" which resulted in an absence of ballot secrecy in those precincts. Plaintiffs' First Amended Complaint, Doc. # 38, at 14, ¶ 82. The City has moved for summary

judgment on this claim based on (1) its use of county election precincts as the geographical unit basis for its districting and (2) the failure of any Plaintiff to identify specific individual harm necessary to establish standing [Doc. # 59]. The Court concludes that the City is entitled to summary judgment based on Plaintiffs' failure to allege individual harm to the secrecy of their ballots.

Each Plaintiff was asked in deposition whether his personal ballot secrecy had been compromised in any way by the City districting plans, either from 1997 or from 1995. None alleged any individual experience involving ballot secrecy.[7] Plaintiff Jon Taylor ("Taylor") testified that he "could have" been harmed, but that he was unable to identify any specific harm. Taylor Depo., Exh. A–7 to Motion for Summary Judgment on Ballot Secrecy Claim, at 40–43. Absent allegations of an actual injury which is "concrete and particularized," Plaintiffs have failed to establish an essential element of the Article III standing requirement. *See Lujan,* 504 U.S. at 560, 112 S.Ct. 2130.

Plaintiffs concede that the Harris County Clerk's practice of combining precincts for voting and reporting purposes has countered administratively any problem created by the small precincts, but contend that the continued existence of these small precincts "presents an ongoing threat to ballot secrecy." Plaintiffs' Response to Motion for Summary Judgment on Ballot Secrecy Claim, Doc. # 70, at 2. Plaintiffs argue that this "reasonable fear" of harm is sufficient to establish standing on the ballot secrecy claim, but they cite no legal authority to support their argument. Their argument is contrary to the Supreme Court's decision in *Lujan,* which requires an injury which is "concrete and particularized," and "actual or imminent", not "conjectural" or "hypothetical." *Id.*

Plaintiffs have failed to identify any circumstances in which the secrecy of their

---

6. Vera submits newspaper articles from the Houston Press and the Houston Chronicle questioning the residency of Richard Johnson, Rev. Gene Moore, and Abel Davila, who at various times were candidates for office in the City of Houston. Response to Motion to Dismiss Blum and Vera, Doc. # 69, Exh. B, C and D.

7. The applicable deposition excerpts of each Plaintiff's deposition are attached to the City's Motion for Summary Judgment on the Ballot Secrecy Claim [Doc. # 59], as Exhibits A.1. through A.12.

ballots was compromised by the City's districting plan and have failed to present any authority which supports their argument that the standing requirement may be satisfied by a "reasonable fear" of harm. The City is entitled to summary judgment on the ballot secrecy claim.

## V. *MOTION FOR SUMMARY JUDGMENT ON FIRST AMENDMENT AND EQUAL PROTECTION CLAIMS*

Plaintiffs allege that the City's 1997 redistricting plan resulted in a violation of their First Amendment rights to petition for redress and to assemble for political purposes. Plaintiffs' First Amended Complaint [Doc. # 38], at 14, ¶ 83. In a similar claim, Plaintiffs allege that the 1997 redistricting plan violates their rights under the Equal Protection clause "by the frustration of efforts of the Plaintiffs and especially those persons residing in connectors to associate with other residents and citizens to effectuate political goals, and the frustration of the ability of Plaintiffs and others to advocate for a candidate of their choice without favoritism to the incumbents or other government-favored candidates." *Id.* at 13, ¶ 81. The City has moved for summary judgment on these two claims on the basis that Plaintiffs lack standing [Docs. # 60 and # 62].

Each Plaintiff was questioned during deposition regarding these claims. None was able to identify any occasion on which he was unable to petition the government for redress, to assemble for political purposes, to associate with other citizens for political purposes, or to advocate for the candidate of his choice.[8] Although Plaintiffs attempt to characterize their deposition responses as "bravado" and the "response of laymen to legal questions,"[9] their inability to allege facts supporting a specific, individual injury resulting from the City's 1997 redistricting plan is fatal to Plaintiffs' standing to assert the First Amendment and Equal Protection claims.

Plaintiffs argue that the 1997 redistricting plan places them in districts in which they may not know the other residents of the district instead of in districts with their current acquaintances. Plaintiffs do not cite any legal authority for this position that electoral districting is required to retain prior associations such that residents of the district are already acquainted with each other. This is not surprising, for it would be an untenable requirement that the City create districts each with approximately 190,000 residents who are all personally acquainted.

Moreover, Plaintiffs do not indicate how the 1997 redistricting plan interferes with their ability to contact and, if Plaintiffs choose, to befriend the other residents of their new districts. As an example, Plaintiff Taylor complains that he does not know people in the Acres Homes area of his district. Taylor Depo., Exh. B to Plaintiffs' Response to Motion for Summary Judgment on Equal Protection Claim [Doc. # 71], at 46. Plaintiff Taylor does not, however, explain how or why he is restricted from meeting the Acres Homes residents if in fact he so desires.

Certain Plaintiffs, while conceding that they have not suffered any actual injury, argue that they believe that other citizens might have suffered such an injury. Plaintiff J.E. White, for example, stated in his deposition, "I believe that I have friends or I believe that a certain group of people's rights are being infringed upon, then I will take that also as a personal infringement upon my rights." White Depo., Exh. A–10 to Motion for Summary Judgment on First Amendment Claim [Doc. # 60], at 50. While this concern for others may be admirable, it does not constitute the individualized "injury in fact" required for Article III standing. *See Hays,* 515 U.S. at 746, 115 S.Ct. 2431.

Plaintiffs fail to identify any actual injury to their individual rights under the First Amendment or the Equal Protection clause. As a result, Plaintiffs have failed to establish a basis for standing to assert these claims.

---

8. The relevant portions of Plaintiffs' depositions are attached to the City's Motions, Docs. # 60 and # 62, as Exhibits A–1 through A–12.

9. Plaintiffs' Response to Motion for Summary Judgment on First Amendment Claim, Doc. # 72, and Response to Motion for Summary Judgment on Equal Protection Claim, Doc. # 71, at 2.

## VI. MOTION FOR SUMMARY JUDGMENT ON ONE-PERSON, ONE-VOTE CLAIM

Plaintiffs allege that the City's 1997 redistricting plan gathered noncitizens into certain districts which resulted in a concentration of noncitizens in small population "minority" districts in violation of the one-person, one-vote requirement of the Equal Protection Clause as set forth in *Burns v. Richardson,* 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966). Plaintiffs' First Amended Complaint [Doc. # 38], at 13, ¶¶ 79–81. The City has moved for summary judgment on this claim, arguing (1) that it could not have purposefully gathered noncitizens together as alleged by Plaintiffs because it did not have the noncitizen demographic data at the time it drew the 1993 districting plan from which the 1997 plan was derived; (2) that the apportionment on the basis of total population, including noncitizens, is consistent with established law; (3) that, using total population figures, the districts comply with the one-person, one-vote standard set forth in *Connor v. Finch,* 431 U.S. 407, 417–18, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977); (4) that Plaintiffs lack standing; and (5) that Plaintiffs have presented no evidence of intent [Doc. # 61].

### A. Plaintiffs' Claim of "Purposeful Gathering"

The undisputed evidence is that the City's 1997 redistricting plan is a derivative, through the City's 1995 plan, of the 1993 districting plan. Plaintiffs concede that the 1993 plan was developed before the City obtained specific noncitizen demographic information which would have enabled the "purposeful gathering" of noncitizens alleged by Plaintiffs. Plaintiffs' Response to Motion for Summary Judgment on One-Person, One-Vote Claim [Doc. # 68], at 3. Although Plaintiffs argue that there was general knowledge that many Hispanics were not citizens and that the specific citizenship information was available and could have been requested earlier by the City, it is uncontested that the City did not have the "citizen voting age population" data prior to the 1993 plan.

The City "gathered" its residents in the 1993 plan without access to the citizenship data. Based on legitimate concerns, such as avoiding voter dislocation and confusion and avoiding potential violations of section 5 of the Voting Rights Act, the 1995 and 1997 districting plans retained significant aspects of the 1993 plan. Plaintiffs have presented no evidence that the 1993, 1995 or 1997 plans were designed intentionally to gather noncitizens together into particular districts.

Instead, Plaintiffs argue and present evidence that it was possible to create districts more equal in population. As discussed below, this argument does not address the correct legal standard. Judicial involvement in the districting process "must end at some point, but that point constantly recedes if those who litigate need only produce a plan that is marginally 'better' when measured against a rigid and unyielding population-equality standard." *Gaffney v. Cummings,* 412 U.S. 735, 750–51, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). A districting plan with a maximum population deviation of less than ten percent falls within the "minor deviation" category. *See Connor,* 431 U.S. at 417–18, 97 S.Ct. 1828.

### B. Use of Total Population Figures

Plaintiffs assert that the City must use citizen population figures instead of total population figures in developing its redistricting plans. Plaintiffs, however, have cited no legal authority to support this proposition. Moreover, the argument previously has been rejected by a federal court in California. *See Garza v. County of Los Angeles,* 756 F.Supp. 1298 (C.D.Cal.1990), *aff'd,* 918 F.2d 763 (9th Cir.1990). As noted by the Ninth Circuit, use of total population figures protects noncitizens' equal protection rights to representation as "persons." *Garza v. Los Angeles County Board of Supervisors,* 918 F.2d 763, 775 (9th Cir.1990), *cert. denied,* 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991). The Court concludes that the City's use of total population figures for its 1997 redistricting plan was consistent with applicable federal law.

## C. *Variation Under Ten Percent*

▊ Redistricting is properly a function of the local governmental entity selected to perform it, and that entity's "work should not be invalidated under the Equal Protection Clause when only minor population variations among districts are proved." *Gaffney*, 412 U.S. at 751, 93 S.Ct. 2321. "[M]inor deviations from mathematical equality ... are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Id.* at 745, 93 S.Ct. 2321. The one-person, one-vote requirement is *prima facie* satisfied if the variation in population between the most populous district and the least populous is less than ten percent, considered such a "minor deviation." *Connor*, 431 U.S. at 417–18, 97 S.Ct. 1828, 52 L.Ed.2d 465.

▊ It is undisputed that the applicable variation for the City's 1997 redistricting plan is 8.63%. "On such a showing, [the Court] is quite sure that a prima facie case of invidious discrimination under the Fourteenth Amendment was not made out." *See Gaffney*, 412 U.S. at 751, 93 S.Ct. 2321, 37 L.Ed.2d 298 (district population deviation of "only about 8%" held insufficient to establish a prima facie case).

Plaintiffs' expert, Dr. Ronald Weber has expressed the opinion that a redistricting plan with smaller population disparity was possible by taking into account the noncitizen component of each district. Weber Second Supplemental Declaration, Exh. B to Plaintiffs' Response to Motion for Summary Judgment on Fourteenth and Fifteenth Amendment Claims [Doc. # 67], at 3. Initially, the Court again notes that it is appropriate to use total population figures; the City is not required to use citizen population figures. Additionally, it remains undisputed that the City's 1997 redistricting plan has a population variation of less than ten percent. The possibility that plans with smaller variations could have been designed does not remove the City's plan from the ten percent "safe harbor" set forth in *Connor*.

## D. *No Evidence of Intent*

Intent is an essential element of a Fourteenth Amendment claim. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Plaintiffs have presented no evidence that the City intended to violate the one-person, one-vote requirement when it created the 1993 districting plan, or when that plan was altered to create the 1995 or the 1997 plans. Plaintiffs' argument that a general awareness of data regarding registration of Spanish-surnamed voters provided "a proxy for information regarding citizenship levels in the districts" is unpersuasive.

▊ Plaintiffs' reliance on the deposition testimony of Council Member Orlando Sanchez that "there is a large number of people of Hispanic decent (sic) that are not naturalized citizens" and that they live "in predominantly Hispanic areas" is also misplaced. Sanchez Depo., Exh. B to Response to Motion for Summary Judgment on One–Person, One–Vote Claim [Doc. # 68], at 28. Such evidence of general awareness on the part of political activists that a number of noncitizen Hispanics reside in Hispanic areas is insufficient to raise a genuine issue of material fact as to the City's intent.

The 1991 Committee Notes, attached as Exhibit I to Plaintiffs' Response, also fail to raise a genuine issue of material fact regarding the City's alleged intent to violate the one-person, one-vote requirement. Indeed, the 1991 Committee Notes indicate an awareness of and an intent to comply with *Connor*'s ten percent parameter. The 1991 Committee Notes reflect a discussion regarding adjustments to district population based on claims by certain minority groups that they were undercounted in the 1990 census. The discussion addressed the difficulties resulting from the City's need to complete the districting plan before a final decision was due from the Bureau of Census regarding the undercount issue. The Committee expressed a desire to adopt a plan which would "remain within the 10 percent parameter" even were there to be an adjustment by the Bureau of Census. 1991 Committee Notes, Exh. 1, at 33.

**E. *Summary Judgment on One–Person, One–Vote Claim***

It is undisputed that the maximum deviation in total population between the most populous district in the City's 1997 redistricting plan and the least populous is less than ten percent. As a result, Plaintiffs cannot establish a *prima facie* violation of the Equal Protection clause's one-person, one-vote principle pursuant to *Connor*, 431 U.S. at 417–18, 97 S.Ct. 1828. Absent other evidence of intent, the City is entitled to summary judgment on this claim.

## VII. *MOTION FOR SUMMARY JUDGMENT ON FOURTEENTH AND FIFTEENTH AMENDMENT CLAIM*

■ Plaintiffs allege that the City's 1997 redistricting plan constitutes racial gerrymandering in violation of the Fourteenth and Fifteenth Amendments because it was based predominantly on racial considerations to the subordination of traditional districting principles. The City has moved for summary judgment on this claim, arguing that the redistricting plan was the result of consideration of all traditional districting principles and that race was not the predominant factor [Doc. # 55].

### A. *Supreme Court Case Law*

***Shaw v. Reno.***—The United States Supreme Court, in *Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), recognized a cause of action where the redistricting decisions were based predominantly on racial considerations to the subordination of traditional districting principles. The *Shaw* Court further recognized, however, that in redistricting matters "the legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination." *Id.* at 646, 113 S.Ct. 2816.

■ In *Shaw*, the Supreme Court noted that one indicator of such racial gerrymandering is the presence of "bizarre" and extremely non-compact shapes which can be explained only as the result of race-based considerations. *Id.* at 649, 113 S.Ct. 2816. In the City's 1997 redistricting plan, the boundaries are not so bizarre that they could only be explained as the result of predominantly race-based considerations. The unusual shape of the districts, particularly District E in which Kingwood is included, is attributable not to the decision-making of the City on the redistricting issue, but to the City's ability to annex areas through the use of extremely narrow connectors. Both Kingwood and the Clear Lake community to which it is joined were annexed with such narrow connectors that any district including these areas would unavoidably have an irregular shape. Plaintiffs attempt to characterize the "bizarre shape" of the districts and of the City as disputed factual allegations. Plaintiffs' Surreply, at 5. It is undisputed that the districts, particularly District E, are unusually shaped. The City has presented evidence, discussed herein, that the City itself has an irregular shape as a result of using very narrow connectors to annex property into the City. Plaintiffs have presented no evidence to the contrary. For instance, they have not suggested an alternative districting plan in which the district shapes are not irregular. Consequently, the City's evidence is uncontroverted on these issues, and Plaintiffs in this case, unlike the plaintiffs in *Shaw*, cannot obtain strict scrutiny based solely on the bizarre shape of the districts.

***Miller v. Johnson.***—The Supreme Court subsequently clarified that a district's bizarre shape is only an indicator, not a mandatory element, of an equal protection claim. *Miller v. Johnson*, 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). The Supreme Court held that the burden of proof is on the plaintiff:

> to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limit-

ed to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial considerations. Where these or other race-neutral considerations are the basis for redistricting legislation, and are not subordinated to race, a state can "defeat a claim that a district has been gerrymandered on racial lines."

*Id.* at 916, 115 S.Ct. 2475. The legislative body developing and adopting the redistricting plan is entitled to a presumption that it acted in good faith. *Id.*

***Bush v. Vera.***—More recently, the Supreme Court specifically recognized that race properly may be taken into account in districting decisions and that districts which contain a particular racial majority are not *per se* equal protection violations. *Bush v. Vera,* 517 U.S. 952, 957–59, 116 S.Ct. 1941, 1951, 135 L.Ed.2d 248 (1996). The Supreme Court also recognized incumbency protection as a traditional districting principle. *Id.,* 116 S.Ct. at 1952. Regarding the bizarre shape of the districts at issue in *Vera,* the Supreme Court noted that the districts were not only bizarre in shape, "they also exhibit[ed] utter disregard of city limits, local election precincts, and voter tabulation district lines." *Id.* at 1959. The Supreme Court held that "[e]lectoral district lines are 'facially race neutral,' so a more searching inquiry is necessary before strict scrutiny can be found applicable in redistricting cases than in cases of 'classifications based explicitly on race.'" *Id.* at 1951.

### B. *The City's Evidence*

The City has presented relevant, probative evidence that it considered and balanced traditional districting principles in developing and adopting the 1997 redistricting plan. The City has attached the following as exhibits to its Motion for Summary Judgment on the Fourteenth and Fifteenth Amendment Claims [Doc. # 57]:(1) memoranda from the City's outside attorneys regarding the legal requirements for districting plans (Exh. 1); transcripts of City Council meetings relating to consideration of the redistricting issues (Exh. 2); the City's Resolution 97–10 setting forth the criteria upon which the 1997 redis-

tricting plan is to be based (Exh. 3); the report to City Council by Jerry Wood ("Wood"), the individual with primary responsibility for developing the 1997 redistricting plan, including the report prepared by the City's expert, Dr. John Alford (Exh. 4); Wood's declaration regarding demographic analysis and the factors considered in developing the plan (Exh. 11); Dr. Alford's declaration regarding the retrogressive effect of including Kingwood in District B (Exh. 15); and excerpts from the deposition of Wood (Exh. 17) and Dr. Ronald Weber, Plaintiffs' expert (Exh. 18). The City has also presented an excerpt from the deposition of Dr. Michael Maggiotto, another expert retained by Plaintiffs (Attachment A to City's Reply) [Doc. # 77].

***Opinions of Counsel.***—The City's outside counsel, in a memorandum to the mayor and council members dated February 21, 1997, advised the City regarding the Supreme Court's decisions in *Shaw* and those cases which followed. The memorandum included a thorough discussion of the competing requirements of the Voting Rights Act and the Fourteenth Amendment. There is no evidence that counsel's legal advice was incorrect, or that this advice of counsel was disregarded by Wood and the City Council in developing the 1997 redistricting plan.

***Redistricting Resolution.***—City of Houston Resolution No. 97–10 established the criteria to be used in developing the redistricting plan. The Resolution provided that geographic boundaries should be followed if possible, and that communities of interest and neighborhoods should be maintained intact. The Resolution also provided that, to the extent possible, the new council districts should be composed of whole county voting precincts and should remain similar to the existing council districts. The goals of maintaining council districts of relatively equal size and preserving incumbent-constituency relations were expressed. The Resolution also recognized the importance of compactness and contiguity, providing:

> The districts should be compact and composed of contiguous territory. Compactness and contiguity, however, involve a functional as well as a geographic dimen-

sion. This functional dimension may take on added weight in situations in which geographic compactness may not be possible in light of the fact that some areas are attached to the remainder of the city only by relatively long and narrow strips of land. Functional compactness and contiguity includes, but is not limited to, consideration of factors such as

- the availability of transportation and communication.
- the existence of common social and economic interests.
- the ability of the citizens of a council district to relate to each other and to their representative on the council and the ability of the council member to relate effectively to his or her constituency.
- the existence of shared interests.

Resolution 97–10, Exh. 3 to Motion for Summary Judgment, at § 2(f).[10] As the final criteria, the Resolution noted that the "plan should be narrowly tailored to avoid retrogression in the position of racial minorities and language minorities as defined in the Voting Rights Act with respect to their effective exercise of the electoral franchise." *Id.* at § 2(h).

***Wood's Report to City Council.***—In a report dated March 28, 1997, Wood described the considerations which were involved in the development of the 1997 redistricting plan and how the plan's design complied with the criteria set forth in Resolution 97–10.[11] None of the changes in the 1997 redistricting plan removed an incumbent council member from his district. The 1997 redistricting plan made changes which replaced local street boundaries with major thoroughfares, such

as the Katy Freeway, or with other major geographic boundaries, such as Buffalo Bayou. Several neighborhoods were reunited. Communities of interest were maintained. Most significantly, Kingwood, a large, upper-middle-class, planned community, was included, intact, in a single district. No county voting precincts were split. The new plan retained, to the extent possible, the existing council districts. The greatest territorial change was to District E, which retained two-thirds of the existing district's population. The variation from the most populous district to the least populous under the 1997 plan was 8.6 percent.

All of the districts in the 1997 redistricting plan contain contiguous territory, although the contiguity is at times based on narrow corridors which are characteristic of the irregular boundaries of the City. The Kingwood area is connected to District E by an eight mile section of canal. The land on either side of the canal, however, is not City property and could not be used as part of any council district. The alternative, including Kingwood in District B, would have involved a similar narrow connector of approximately 9 1/2 miles.

Consideration of other factors indicated a much stronger community of interest between Kingwood and the remainder of District E, particularly Clear Lake City, than between Kingwood and the remainder of District B. Clear Lake City, like Kingwood, is a large planned community. Both are inhabited predominantly by well-educated, upper middle class residents who vigorously opposed annexation into the City. As noted by Wood in his report:

**10.** The concept of functional compactness was recognized by a three-judge federal court in the Eastern District of California in *DeWitt v. Wilson,* 856 F.Supp. 1409 (E.D.Cal.1994), which was summarily affirmed in relevant part by the United States Supreme Court, 515 U.S. 1170, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995). The Court recognizes that the three-judge court's opinion in *De Witt* is not binding authority, and the Court's decision herein is not dictated by the Supreme Court's summary affirmance. *See Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). The Court is persuaded, however, that the concept of functional compactness is an appropriate districting principle to be

considered by legislators in developing districting plans in situations, such as presented in this case, in which true geographical compactness is not feasible because of the configuration of the area being districted.

**11.** Additionally, in his Declaration and during his deposition, Wood described the considerations involved in the decision to include Kingwood in District E rather than in District B. Attached to the Declaration are maps and demographic analyses of the 1997 redistricting plan, the 1995 redistricting plan, and the 1996 annexations.

[Kingwood and Clear Lake City] share common issues in the delivery of municipal services, which Kingwood does not share with the balance of District B. Kingwood and Clear Lake City are master planned communities with a system of small area community associations with umbrella area associations to address community-wide services and issues. Both have extensive systems of private parks and recreation facilities.... Both communities have privately owned and maintained trail systems with similar security and maintenance issues. Both communities choose to handle solid waste pick up locally through sponsorships. They share an interest in maintaining the City's policy on sponsorships and in future increases in sponsorship subsidies. (No other District B neighborhood uses a sponsorship for solid waste pick up.) The infrastructure in both Clear Lake City and Kingwood is relatively new, and is built to high standards.

Wood Redistricting Report, Exh. 4 to Motion for Summary Judgment, at 5–6.

With reference to the retrogression issue, Wood reported, based in part on the expert opinion of Dr. Alford attached as an exhibit to Wood's report, that the inclusion of the Kingwood area in District B would have a potentially retrogressive effect on African–Americans in District B and would have a more significant retrogressive effect on Hispanics in Districts H or I.[12] Another aspect of Section 5 considered by the City Council was the disruptive effect a Section 5 challenge would have on City elections. As discussed by the Mayor and counsel for the City, if a plan is not precleared under Section 5 of the Voting Rights Act, there can be no elections held using that plan. Transcript of April 9, 1997 Public Hearing, attached as Exhibit 2(C) to the City's Motion for Summary Judgment [Doc. # 57], at 45.

**Dr. Alford's Report and Declaration.**— The City has also submitted the Declaration of Dr. Alford regarding the likelihood of a retrogressive effect caused by the inclusion of Kingwood in District B and the resulting changes to Districts H and/or I which would result. Dr. Alford, a tenured professor of political science at Rice University, also determined that the proposed redistricting plan involved a "tradeoff of several traditional districting concerns. Concern for minimizing disruption of existing district lines, non-retrogression, and authenticity are balanced here against the concern for geographical compactness." Assessment of the City of Houston's Proposed District Plans, attached to Wood Report, Exh. 4 to Motion for Summary Judgment, at 12.

Dr. Alford discussed the major similarities between Kingwood and Clear Lake City. Dr. Alford also noted that the lack of precise geographical compactness was not the result of "block-picking" but was, instead, the result of "exterior boundaries of the city itself [which] are not smooth," and an "annexed area [which] is connected to the city by a narrow corridor." Id. at 13–14. Dr. Alford determined that "[a]ny district that contains Kingwood will necessarily appear non-compact in its outline. This is a function of the boundaries of the city and the annexed area.

12. "Retrogression" (i.e., the act of moving backwards to an earlier and usually worse condition, see THE RANDOM HOUSE DICTIONARY (unabridged), at 1225) is a term first used in Beer v. United States, 425 U.S. 130, 141, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). In Beer, the Supreme Court held that the purpose of Section 5 of the Voting Rights Act is "to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." Id. Later, cases further elaborated: "Retrogression, by definition, requires a comparison of a jurisdiction's new voting plan with its existing plan." Reno v. Bossier Parish School Bd., 520 U.S. 471, ——, 117 S.Ct. 1491, 1497, 137 L.Ed.2d 730 (1977). "Under § 5, then, the proposed voting practice is measured against the existing voting practice to determine whether retrogression would result from the proposed change." Holder v. Hall, 512 U.S. 874, 883, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994). The City's existing plan at the time of the 1997 plan's development and adoption was the 1995 plan, which had been precleared by DOJ and was currently in effect. Although Plaintiffs argue that prior plans, beginning with the 1991 redistricting plan, were constitutionally defective for the same reasons they challenge the 1997 plan, it is uncontroverted that the 1995 plan has not been held unconstitutional and, as a result, it is the proper benchmark. See Abrams v. Johnson, 521 U.S. 74, ——, 117 S.Ct. 1925, 1938–39, 138 L.Ed.2d 285 (1977). Moreover, Plaintiffs provide no probative evidence that the 1991 or 1993 plans were discriminatory.

The narrow corridors of these plans are narrow because the city itself is narrow at those points.... In this case the narrow corridors can not be widened without moving outside the city limits. Any districting plan will have to incorporate these narrow corridors into one or more of the nine districts." *Id.* at 14. Dr. Alford concluded that "the proposed plans are a clearly acceptable balancing of traditional districting concerns. No plan will be optimal on all fronts simultaneously." *Id.*

*Plaintiffs' Opposition to Wood and Alford Reports.*—Plaintiffs argue that the Wood and Alford reports should not be considered significant, citing cases which involve reports prepared for litigation and not available to the decision-making body for use at the time the redistricting plan was adopted. Specifically, Plaintiffs cite *Shaw v. Hunt,* 517 U.S. 899, 909–11, 116 S.Ct. 1894, 1903, 135 L.Ed.2d 207 (1996), in which two reports "prepared for the litigation" were deemed irrelevant because they "were not before the General Assembly when it enacted" the districting plan. Plaintiffs also cite *Vera v. Richards,* in which the district court gave little value to a demographic study compiled "specifically for this trial" where there was "no evidence that the information it contain[ed] was available to the Legislature in any organized fashion before [the challenged district] was created." *Vera v. Richards,* 861 F.Supp. 1304, 1338 (S.D.Tex.1994), *aff'd* 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996).

The undisputed evidence establishes that the Wood and Alford reports were prepared prior to the City Council's consideration of the 1997 plan. While perhaps these reports were prepared with an awareness that litigation was likely, they were available to City Council for consideration in reaching its decision on redistricting, and were not prepared as an afterthought during litigation. The Court finds that the Wood and Alford reports are competent summary judgment evidence and rejects Plaintiffs' argument that they should not be considered.

*Transcripts of Public Hearings.*—Public hearings on the redistricting were held February 26, 1997, April 2, 1997, and April 9, 1997.[13] At the public hearing on February 26, 1996, citizens of the City spoke in favor of and against the City's redistricting plan. Wood subsequently considered the various comments and either made changes to the plan or explained why the change could not be accomplished.[14]

The public hearing transcripts also reflect that the City Council carefully considered the proposed plan and the feasibility of various modifications. The possibility of splitting Kingwood between two districts was considered and summarily rejected because it would not conform with the redistricting principle that neighborhoods should not be divided. Hearing Tr., Exh. 2(A), at 13. Adding Kingwood to District A was considered, and it was determined that it would be too disruptive to the other districts because District A was already near the maximum population limit and the addition of approximately 50,000 additional residents to District A would require that approximately 50,000 residents of District A would have to be moved to another district, requiring significant changes throughout the City. Hearing Tr., Exh. 2(B), at 10–11, 57–58. The addition of Kingwood to District B was determined to be potentially, if not probably, retrogressive under Section 5. Hearing Tr., Exh. 2(B), at 10.

The transcripts of the public hearings also establish that the City Council had before it no alternative citywide plan for consideration. Wood's task, as it had been for past redistrictings, "was for staff to present the plan that best describes or meets the criteria as staff can produce it and under the direction of the legal department, rather than

13. Transcripts of the hearings are attached as Exhibits to the City's Motion for Summary Judgment [Doc. # 57]. The transcript of the public hearing held February 26, 1997, is Exhibit 2(A), the April 2, 1997, public hearing transcript is Exhibit 2(B), and the April 9, 1997, public hearing transcript is Exhibit 2(C) (herein cited as Hearing Tr., Exh. 2(*), at *).

14. For example, a citizen complained during the February hearing that Precinct 1106 was located in District H. Hearing Tr., Exh. 2(A), at 111–12. As a result of Wood's consideration of those comments, Precinct 1106 was removed from District H. Hearing Tr., Exh. 2(B), at 9–10.

alternate plans." Hearing Tr., Exh. 2(C), at 31. A proposal referred to as the "Polyansky–Stetson Plan," submitted on behalf of Plaintiff Blum and others, was not a citywide plan; rather, it was simply a map showing the inclusion of Kingwood in District B with all other districts remaining blank. Hearing Tr., Exh. 2(B), at 55. City Council, when discussing the Polyansky–Stetson Plan, noted negatively that the "Plan" was not a citywide proposal, placing Plaintiffs on notice of the City Council's concerns and questions. However, no proposals addressing the complexities of dealing with the remaining districts from the plan were presented to City Council by the April 9, 1997 hearing and vote. Hearing Tr., Exh. 2(C), at 15. Indeed, Plaintiffs have not submitted an alternate citywide plan in opposition to the Motions for Summary Judgment.[15]

### C. Plaintiffs' Evidence

To avoid summary judgment on their Fourteenth and Fifteenth Amendment claims of racial gerrymandering, Plaintiffs must present evidence to raise a genuine issue of material fact regarding whether race was the *predominate* consideration to the *subordination* of traditional districting principles. In an effort to satisfy this burden, Plaintiffs rely on the evidence submitted in support of their prior request for a preliminary injunction, as well as the following exhibits which are attached to their Opposition to the City's Motion for Summary Judgment [Doc. # 67]: declarations (Exh. A and Exh. B) and deposition excerpts (Exh. H) ("Weber Depo.") of Dr. Ronald Weber, Plaintiffs' expert; deposition excerpts of City Council Members J.W. Roach, Jr. (Exh. D) and O. Sanchez (Exh. E); the declaration of Dr. Maggiotto (Exh. I); reports regarding the City's 1991 redistricting plan (Exh. F and Exh. K); and a portion of the letter from the City's counsel to the Department of Justice regarding preclearance of the 1996 annexations (Exh. J).

Plaintiffs attach to their Surreply a Third Supplemental Declaration of Dr. Weber (Exh. A), a North Carolina districting plan (Exh. B), a Memorandum Opinion from the Eastern District of North Carolina (Exh. C), and the United States Supreme Court's denial of a stay in the North Carolina case (Exh. D). Plaintiffs also argue in their Response that the decision of certain City Council Members to invoke legislative immunity is evidence that their testimony would be detrimental to the City's position in this case.

*Dr. Weber's Reports and Deposition.*— Plaintiffs' expert, Dr. Ronald Weber, expresses the opinion in his original report,[16] in supplemental declarations, and in his deposition testimony that the City's 1997 redistricting plan used race and ethnicity as predominant factors to the subordination of race-neutral traditional districting principles. Weber Report, Exh. 7A, at 31–32. The primary basis for his opinion involves a history of City districting in the 1990s. Following the 1990 census, the City adopted its first redistricting plan in June 1991. The Department of Justice ("DOJ") objected to the plan, and the City responded with the adoption of a plan (referred to as "Plan 3") which included two Hispanic-majority districts, H and I. This plan received DOJ preclearance on October 12, 1991, but was never used in City elections because a federal judge ordered that the November 1991 elections be conducted pursuant to the original plan to which DOJ had objected. Weber Report, Exh. 7A, at 11–12.

It is Dr. Weber's opinion that the 1991 plan was based predominantly on race because it was developed to satisfy DOJ requirements when the City should instead have "gone to the district court of the District of Columbia and ... gotten preclearance from that court rather than going to the overly zealous Department of Justice at the time in 1991." Weber Depo., at 94. Based

---

**15.** The Court notes that Plaintiffs do not have an evidentiary burden in this suit to create and propose a complete alternative redistricting plan. However, their failure to clarify this proposal for City Council reduced the relevance and probative value of the putative plan when it was suggested since the City had to consider numerous and sometimes competing constitutional factors in designing a city-wide redistricting plan.

**16.** Dr. Weber's original report was attached as Exhibit 7A to Plaintiffs' Motion for Preliminary Injunction [Doc. # 29] (herein cited as "Weber Report, Exh. 7A, at * ").

on his opinion that the 1991 plan was race-based, Dr. Weber further opines that "everything after that is invalid because it is dominated by race ... by the '91 decision." Weber Depo. at 93.[17] Indeed, Dr. Weber declines to consider the retrogressive effect on District H of a redistricting plan which includes Kingwood in District B because, in Dr. Weber's opinion, the City should not have created District H in 1991, so "the City didn't need to worry about the impact on District H." Weber Depo. at 107.

Dr. Weber conceded in his deposition that he did not consider idiosyncratic factors, such as where an incumbent's relatives reside or where certain institutions are located. Weber Depo. at 25. Dr. Weber also stated in his original report that he did not consider other criteria relied upon by the City in developing the 1997 redistricting plan. Specifically, Dr. Weber did not consider the City's interest in maintaining existing districts because the existing districts were established in the 1991 plan which Dr. Weber believes was race-based. Dr. Weber also did not consider certain aspects of the community of interest criteria, such as income, education, and automobile ownership versus public transportation, because these aspects could be correlated with race and, therefore, Dr. Weber deemed them also based on race. Weber Report, Exh. 7A, at 27–28; Weber Depo. at 195.

Dr. Weber's opinion that the 1997 redistricting plan used race as the predominant factor is also based on his opinion that the inclusion of Kingwood in District B would not be retrogressive to African–Americans in District B. Weber Report, Exh. 7A, at 26. It is Dr. Weber's belief that modifications to a district which reduce the voting age population of a minority from a level at which its ability to elect candidates of choice is "safe" to a level at which the outcome is a "toss-up"

is not retrogressive. Weber Depo. at 48. It is Dr. Weber's opinion that the City should have conducted an analysis and devised a redistricting plan which reduced the percentage of minority population to "a lower number that's closer to what [Dr. Weber finds] is the threshold at which blacks have an effective opportunity to participate." Weber Depo. at 37.

Plaintiffs have cited no authority for this position that the City violates the United States Constitution unless it creates districts which contain the lowest population of minorities necessary to permit them to participate in the electoral process. Indeed, Dr. Weber conceded that the Constitution, as interpreted by the Supreme Court in *Shaw* and the cases which followed *Shaw*, requires that the City not create districts that are based predominantly on such racial considerations. Weber Depo. at 226.[18]

Although Dr. Weber's opinion may raise a genuine issue of material fact regarding the retrogressive effect on African–Americans of a redistricting plan which includes Kingwood in District B, it fails to raise a genuine issue of material fact regarding the City's permissible consideration of retrogressive effect as a districting principle and its reasonable concern that retrogression would result from the placement of Kingwood in District B. Dr. Weber's opinion also fails to raise a genuine issue of material fact regarding whether race was the predominant factor in the development of the 1997 plan and that traditional districting principles were subordinated to considerations of race.

Moreover, to the extent Dr. Weber's conclusions rely on the premise that this Court should reconsider the constitutionality of and the City's intentions in creating the 1991, 1993, and 1995 districting plans, the Court rejects the premise. Those plans are not before the Court for evaluation of that na-

---

**17.** Dr. Weber's opinion that any plan based on the 1991 districting plan would be unconstitutional as based on race would require that the City have created a new "scorched earth" plan in 1997. As noted previously, this would be inconsistent with the criteria that existing council districts be maintained to the extent possible. Moreover, as noted by Dr. Alford in his Assessment of the City's Proposed District Plans, it would be inefficient to develop an entirely new

districting plan at this point because the 2000 census "will require a major reapportionment-based redistricting." Exh. 4 to Motion for Summary Judgment, at 14.

**18.** Plaintiffs have recently stated "emphatically" that they do not adopt this argument expressed by Dr. Weber. Plaintiffs' Surreply, at 3.

ture, and there is no legal basis of which the Court can conceive to permit the review of plans that have become final and have been reviewed to the extent necessary by law.

### Statements by City Council Members.—

Plaintiffs also present the deposition testimony of two City Council Members, J.W. Roach, Jr. and O. Sanchez.[19] Roach testified that race was a "big criterion in redistricting around here." Roach Depo. at 30. Although Roach testified that he believed race was the deciding factor, Roach Depo. at 59–60, he conceded that it was simply his opinion. Roach Depo. at 71. Sanchez testified similarly that he considered race to have been the deciding factor, stating that he believed Kingwood would have been included in District B if Kingwood had been predominantly African–American or if District B had been predominantly poor Anglos. Sanchez Depo. at 31–32.

The Court notes initially that both Roach and Sanchez opposed the City's 1997 redistricting plan. It is clear from these Councilmen's deposition testimony, which the Court has no reason to find incredible, that they believed that the 1997 plan constituted racial gerrymandering. As a result, they appropriately voted against the plan. The opinions of Roach and Sanchez, however, are simply their individual lay opinions and are not admissible evidence.

Moreover, the opinions of individual council members are not material; the relevant inquiry concerns the intent of the City through its City Council as a legislative body. The City Council Public Hearing transcripts reflect that the council as a legislative body did not consider race the only determining factor:

COUNCIL MEMBER SAENZ: ... Has there ever been any discussion by this administration, or anyone on council, that says that race is to be the only determining factor here, a request that says we need to divide this based on race only?

MR. HEATH: No one has made any suggestion like that to me. I am not aware of one, and I would be surprised.

\* \* \* \* \* \*

COUNCIL MEMBER SAENZ: So it's just not race; and there has never been any discussion, at this table or anywhere else, that is solely based on race. Is that my understanding?

MR. HEATH: That is correct.

Hearing Tr., Exh. 2(C), at 19, 23.

MAYOR LANIER: ... the factors [Council Member Castillo] mentioned were actually the factors, and others like them, that were discussed by me with the staff and Mr. Heath as we looked at this redistricting question; and the only way race came up was the connection with the restriction against regression (sic) as set forth in the Voting Rights Act.... there was never a suggestion that we should use race as a global criteria.

Hearing Tr., Exh. 2(C), at 54–55. Plaintiffs' evidence that two or three council members believed race was the "big criterion" does not raise a genuine issue of material fact as to the basis for the City's adoption of the 1997 redistricting plan.

### Dr. Maggiotto Opinion.—

A second expert retained by Plaintiffs, Dr. Maggiotto, expressed the opinion that District E in the 1997 redistricting plan is not geographically compact. This issue is undisputed by the City but, as discussed previously, any district which includes Kingwood would not be geographically compact because the annexed area is not geographically compact to the remainder of the City. Consequently, Dr. Maggiotto's opinion regarding compactness addresses only an undisputed issue.

Dr. Maggiotto also expresses his opinion that "the claim that Houston districts may represent homogeneous communities of interest is undermined by the variability observed across socioeconomic variables commonly used to stratify populations" and that "the particular claim that District E represents a homogenous community, whose com-

---

**19.** Council Member Roach's Deposition Transcript ("Roach Depo.") is attached as Exhibit D to Plaintiffs' Opposition to the City's Motion for Summary Judgment [Doc. # 67]. Council Member Sanchez's Deposition Transcript ("Sanchez Depo.") is attached as Exhibit E.

mon interests support significant departures from district compactness is doubtful." Maggiotto Report, Exh. I, at 14. Initially, the Court notes that Dr. Maggiotto's opinion is based entirely on his review of certain data provided to him by Plaintiffs. There is no indication in the record that Dr. Maggiotto visited either Kingwood or Clear Lake City or that he interviewed residents of either community regarding their relevant interests.

More importantly, there is no claim by the City that District E represents a "homogenous community." The City's decision to include Kingwood in District E rather than in Districts B or A was based, in part, on its determination that Kingwood shared a *greater* community of interest with Clear Lake City than it did with other contiguous districts. Dr. Maggiotto's opinion does not dispute this determination. Indeed, the only comment by Dr. Maggiotto on this point is that Kingwood would be "equally at home" in District O. Maggiotto Report, Exh. I, at 13. District G, however, is located in the western part of the City, while Kingwood is in the far northeastern region. In any event, District G has no land contiguous with Kingwood.

Finally, Dr. Maggiotto's statistical analysis of certain data and his resulting opinion that District E is neither compact nor homogenous is not relevant to the issue before the Court. Dr. Maggiotto testified that his report does not address whether race was the predominate factor in the City's plan. Maggiotto Depo., Exh. A to City's Reply [Doc. # 77], at 94. As a result, the evidence presented by Dr. Maggiotto fails to raise a genuine issue of material fact regarding whether the 1997 redistricting plan constitutes racial gerrymandering.

***Evidence Regarding 1991 Plan and Kingwood Annexation.***—As discussed previously in connection with the opinions of Dr. Weber, the development of the 1991 plan, even if based on race as the predominant consideration to the subrogation of all other districting principles, is not relevant to the issue before the Court regarding the 1997 redistricting plan. The issues regarding pre-clearance of the Kingwood annexation are likewise irrelevant to whether the 1997 redis-

tricting plan violates Plaintiffs' constitutional rights.

***Claim of Legislative Immunity.***—During discovery in this case, Council Member Martha Wong filed a Motion to Quash Subpoena [Doc. # 45] invoking her legislative immunity. Plaintiffs argue the decision by Council Member Wong and other council members who voted in favor of the adopted plan to invoke legislative immunity is evidence that their testimony would have been detrimental to the City's position and would have supported Plaintiffs' position. This argument is unpersuasive.

As noted by the Court in its order granting Council Member Wong's Motion, legislative immunity exists to protect the workings of the legislature from intrusion by the judiciary. Order [Doc. # 49], at 2, *citing Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The Court also noted that "[c]onfidential communications among legislators in conducting legislative business is an essential element of our system of government, a system which is to be fostered and protected by the community.... damage to the legislative process if the legislators were required to disclose their own confidential communications and thoughts, as well as those of their fellow legislators, would be significant." Order, at 4. Council Member Wong's decision to invoke legislative immunity can be considered evidence of her intent to protect the legislative process as easily as it can be considered evidence of detrimental testimony.

### D. *Summary Judgment*

The City has presented evidence which establishes that the 1997 redistricting plan was the result of careful consideration and balancing of traditional districting principles. The district shapes and the lack of precise geographical compactness are an unavoidable result of the shape and lack of compactness of the City itself. Although it is undisputed that race was a consideration, the City has presented evidence that race was not the predominant factor.

Plaintiffs have presented significant probative evidence that the City considered race an important factor in its 1997 redistricting decision. Plaintiffs have also presented evidence that certain determinations made by the City in developing the plan may have been in error. For example, it is possible that the addition of Kingwood to District B would not have resulted in actual retrogression as to African–Americans in that district. Plaintiffs have failed, however, to satisfy their burden of producing evidence which, separately or in combination, raises a genuine issue of material fact regarding their claim that race was the predominant factor to the subrogation of traditional districting principles. Plaintiffs have not presented evidence from which a reasonable jury could conclude that race was "the criterion that, in the [City's] view, could not be compromised." *See Shaw*, 116 S.Ct. at 1901.

Plaintiffs in their Surreply cite a recent opinion by two members of a three-judge court[20] in the Eastern District of North Carolina granting summary judgment for the plaintiffs in on a racial gerrymandering claim. *Cromartie v. Hunt*, No. 4:96–CV–104(BO)(3) (E.D.N.C. April 14, 1998). The Eastern District of North Carolina's decision to grant summary judgment for the plaintiffs on the evidence before it is no more persuasive that the Eastern District of California's decision in *DeWitt* to grant summary judgment for the legislature on the evidence in that case. The Court's decision can be based only on the evidence presented by the parties in this case as it relates to the City's 1997 redistricting plan.

Based on the foregoing, the City is entitled to summary judgment on Plaintiffs' Fourteenth and Fifteenth racial gerrymandering claims.

## VIII. *CONCLUSION*

Plaintiff Blum is no longer a resident of the City, and Plaintiff Vera is not a properly registered voter in District H and is not registered in any other district. As a result, these two Plaintiffs lack standing in this litigation for prospective relief and will be dismissed by separate order.

Plaintiffs have failed to identify any individual injury to the secrecy of their ballots. Similarly, Plaintiffs have failed to allege individual harm which would satisfy the standing requirement as to their First Amendment and Equal Protection claims. Based on total population figures, the districts in the 1997 redistricting plan are within a ten percent population differential which complies with the holding of the United States Supreme Court in *Connor v. Finch*, 431 U.S. 407, 417–18, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977). Absent probative evidence of intent, Plaintiffs have failed to raise a genuine issue of material fact regarding their one-person, one-vote claim.

The City has presented significant evidence that the 1997 redistricting plan adopted by the City Council was based on consideration and balancing of traditional districting principles including, but not dominated by, race. Despite arduous argument and evidence with certain superficial relevance proffered by Plaintiffs, the Court concludes after close analysis that Plaintiffs have failed to present evidence that raises a genuine issue of material fact regarding their allegation that race was the predominant factor in the City's 1997 redistricting plan to the substantial derogation of traditional districting principles. The City is entitled to summary judgment, which will be issued by separate order.

---

**20.** Hon. Sam J. Ervin III, the circuit judge member of the three-judge court, issued a dissenting opinion.